## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                          Case No. 8:04-6469-PMG


TERRY LEE WINGATE,

_____Debtor.                Chapter 7

SYNGENTA SEEDS, INC.,

                                    Plaintiff,

vs.                                                               Adv. No. 8:04-ap-311-PMG


TERRY LEE WINGATE ,

_____Defendant.


## FINDINGS OF FACT, CONCLUSIONS OF LAW,
## AND MEMORANDUM OPINION

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned

adversary proceeding.

The Plaintiff, Syngenta Seeds, Inc., commenced this proceeding by filing a Complaint Objecting

to the Debtor's Discharge.  Generally, the Plaintiff alleges that the discharge of the Debtor, Terry Lee

Wingate, should be denied pursuant to §727(a)(2)(A) of the Bankruptcy Code because the Debtor

transferred certain property within one year before the date that he filed his bankruptcy petition, with

the intent to hinder, delay, or defraud his creditors.  Additionally, the Plaintiff alleges that the Debtor's

discharge should be denied pursuant to §727(a)(4) of the Bankruptcy Code because he made false

1

oaths on his bankruptcy schedules by undervaluing or mischaracterizing his ownership interest in certain property.

In response, the Debtor acknowledges that certain transfers were made, but contends that the property transferred was owned by the Debtor and his wife as tenants by the entireties. Because the property was exempt under Florida law, therefore, the Debtor asserts that he did not possess the intent to defraud his creditors at the time that the transfers were made. Further, the Debtor contends that any inaccuracies on his bankruptcy schedules were not made "knowingly and fraudulently" within the meaning of §727(a)(4).

### Contents

| | |
|---|---|
| Background ………………………………………………………………… | 3 |
| Discussion ………………………………………………………………… | 9 |
| I. Section 727(a)(2)(A) ………………………………………………… | 9 |
|    A. Counts I & II ……………………………………………………... | 10 |
|       1. Intent to defraud ………………………………………………… | 10 |
|          a. Transfer of entireties property ………………………………… | 11 |
|          b. The presumption regarding entireties property ……………… | 13 |
|       2. The accounts ……………………………………………………… | 14 |
|          a. The H&R Block account ……………………………………… | 14 |
|          b. The Liberty Savings Bank account ………………………… | 15 |
|       3. Application …………………………………………………….... | 16 |
|    B. Count III ………………………………………………………….... | 21 |
| II. Section 727(a)(4) ……………………………………………………... | 23 |
|    A. The alleged false oaths ………………………………………………… | 24 |
|       1. The Tennessee property ………………………………………… | 24 |
|       2. The timeshare …………………………………………………… | 25 |
|       3. The Sarasota Coastal Credit Union accounts ………………………… | 26 |
|       4. The vehicles …………………………………………………… | 27 |
|    B. Application ………………………………………………………… | 27 |
| Conclusion ………………………………………………………………… | 29 |

**Background**

The Debtor and Marsha Wingate (Marsha) were married in 1976 and have been married continuously since that time. (Plaintiff's Exhibit 12).

For twenty years prior to 1990, the Debtor was employed by Primerica Financial Services, a financial services company. During his career, the Debtor served as a senior vice president for Primerica, and was principally involved in the marketing of term life insurance and mutual funds. (Transcript, p. 81).

In 1990, the Debtor became disabled as the result of an automobile accident, and discontinued his employment relationship with Primerica. (Transcript, p. 156).

In 1997, the Debtor and Nicholas Eigsti (Eigsti) formed a corporation known as Seedless Enterprise, Inc. "for the purpose of propagating and marketing seedless watermelon seeds." (Debtor's Exhibit 2, p. 3). The Debtor and Eigsti each owned a fifty percent interest in Seedless Enterprise, Inc. (SEI).

In October of 1998, the Plaintiff's predecessor-in-interest, American Sunmelon, commenced a trademark infringement action against SEI in the United States District Court for the Middle District of Florida.

On May 10, 1999, SEI, Eigsti, the Debtor, and the Plaintiff's predecessor entered into a Settlement and Release Agreement to resolve the trademark infringement action. (Plaintiff's Exhibit 5; Debtor's Exhibit 1). Pursuant to the Settlement Agreement, the Plaintiff's predecessor agreed to pay the SEI Parties (defined as SEI, Eigsti, and the Debtor) the total sum of $2,500,000.00. Specifically, the Plaintiff agreed to pay the sum of $1,000,000.00 to the SEI Parties by May 21, 1999, followed by five annual payments in the approximate amount of $300,000.00 each commencing on May 21, 2000, and

continuing each year thereafter until May 21, 2004. In exchange for these payments, SEI, Eigsti, and the Debtor agreed, among other covenants, not to engage in the business of developing, manufacturing, or marketing watermelon seed products for a period of five years.

The Plaintiff paid the sum of $1,000,000.00 to SEI on May 21, 1999, in accordance with the Settlement Agreement. (Debtor's Exhibit 2, p. 9; Transcript, p. 93). Of the $1,000,000.00 paid on that date, the Debtor received in excess of $400,000.00 as his share of the initial installment. (Transcript, pp. 93-94).

On October 12, 1999, the Debtor and Marsha opened an investors account with Olde Discount Corporation. (Plaintiff's Exhibit 2; Debtor's Exhibit 4). The account was originally funded by a deposit of $200,000.00, which represented a portion of the settlement proceeds received from the Plaintiff in May. (Transcript, pp. 93-94). On the Account Application, the Debtor and Marsha indicated their desire to own the account as "Joint Tenants with Rights of Survivorship." (Plaintiff's Exhibit 2; Debtor's Exhibit 4).

Pursuant to the terms of the Settlement Agreement, the Plaintiff subsequently paid SEI the sum of $384,750.00 on May 21, 2000, the sum of $345,120.00 on May 21, 2001, and the sum of $315,570.00 on May 21, 2002. (Debtor's Exhibit 2, p. 9). Of the total settlement funds, the Debtor received the approximate sum of $979,000.00. (Transcript, pp. 87-88)

On May 23, 2002, the Debtor and Marsha opened a money market account at Liberty Savings Bank. (Plaintiff's Exhibit 9; Debtor's Exhibit 6; Transcript, p. 108). The account was initially funded with the Debtor's share of the payment made by the Plaintiff on May 21, 2002, pursuant to the Settlement Agreement. (Transcript, p. 154). Specifically, the sum of $157,552.50 was deposited into the account on May 23, 2002, the day that the account was opened. The record does not establish

4

whether the Debtor and Marsha expressly designated a form of ownership for the Liberty account. The statements related to the account, however, were addressed to "Terry L. Wingate or Marsha B. Wingate POD." (Plaintiff's Exhibit 9; Debtor's Exhibit 7).

Less than six weeks later, in July of 2002, the Debtor and Marsha sold a home that they had jointly purchased in Tallahassee, and received net proceeds from the sale in the amount of $118,322.68. (Debtor's Exhibit 8). The proceeds from the sale of the Tallahassee home were deposited into the account at Liberty Savings Bank. (Plaintiff's Exhibit 9; Debtor's Exhibit 7).

In mid-2002, the Plaintiff filed an action against SEI, Eigsti, and the Debtor in the United States District Court for the Middle District of Florida. Generally, the Plaintiff alleged that the defendants had breached five separate covenants contained in the Settlement Agreement, and sought rescission of the Agreement. The Debtor was served with a copy of the Plaintiff's Complaint in the late summer or early fall of 2002. (Transcript, pp. 143-44).

On March 4, 2003, the District Court entered an Order on Summary Judgment in which it determined that the defendants had breached three of the five covenants at issue. (Debtor's Exhibit 2, p. 1).

On April 14 through April 16, 2003, a jury trial was conducted in the District Court with respect to the two remaining breach of contract issues. (Debtor's Exhibit 2, p. 1; Transcript, p. 15).

On April 21, 2003, the Debtor and Marsha withdrew the sum of $40,000.00 from the account at Liberty Savings Bank. (Transcript, p. 16; Plaintiff's Exhibit 9).

Also on April 21, 2003, the Debtor and Marsha sold municipal bonds held in their H&R Block account (formerly the Olde Discount investors account) for the sum of $101,624.76. (Debtor's Exhibit 5).

On April 22, 2003, the Debtor and Marsha entered into an Annuity Contract with Jackson National Life Insurance Company. (Plaintiff's Exhibit 27). The premium or consideration paid for the annuity was $142,630.00. The parties have stipulated that the annuity was purchased "with $102,630, from the H&R Block account, and $40,000, from the Liberty Savings Bank account." (Transcript, p. 16).

Also on April 22, 2003, the Debtor and Marsha wrote a check on the Liberty Savings Bank account in the amount of $117,246.75. (Plaintiff's Exhibit 9). The parties have stipulated that "the Debtor used $117,246.75 of funds in a Liberty Savings Bank account to pay off the mortgage on his homestead residence." (Transcript, p. 16). A Satisfaction/Discharge of Mortgage relating to the Debtor's homestead, dated May 23, 2003, was recorded in the public records on June 26, 2003. (Plaintiff's Exhibit 19).

On the same date that the check was written to satisfy the home mortgage, it appears that the Debtor and Marsha withdrew the balance of the funds and closed the Liberty Savings Bank account. (Plaintiff's Exhibit 9).

On April 23, 2003, the day after the account was closed, the District Court issued its Memorandum Opinion in the breach of contract and rescission action commenced by the Plaintiff. (Debtor's Exhibit 2). In the Opinion, the District Court found that "one or more of the Defendants" had breached the covenants contained in the Settlement Agreement, and that the breaches were material and fundamental to the underlying purpose of the Agreement. Accordingly, the Court determined that rescission of the Settlement Agreement was an appropriate remedy, and established the amount of the damages necessary to restore the Plaintiff to its pre-Settlement position. (Debtor's Exhibit 2, p. 8).

6

The caption of the Judgment entered contemporaneously with the Opinion, however, names Eigsti as the only defendant in the action. (Debtor's Exhibit 2).

On June 25, 2003, the District Court entered an Amended Judgment in favor of the Plaintiff and against SEI, Eigsti, and the Debtor in the amount of $2,064,288.50. (Plaintiff's Exhibit 1).

The parties have stipulated that "on July 23, 2003, the following assets were transferred out of 'Terry Wingate or Marsha Wingate' ownership into Marsha Wingate's name individually:  1) a 1999 22-foot Maverick Boat Company boat, purchased for more than $20,000;  2) a 1997 Chevy Tahoe; and 3) a 1996 Chrysler Town and Country minivan.  The Debtor did not receive any consideration for these transfers." (Transcript, pp. 16-17).  Marsha testified that she unilaterally effected the transfers of the vehicles without the prior knowledge of the Debtor.  (Transcript, pp. 150-52; Plaintiff's Exhibit 11).

In August of 2003, the Debtor and Marsha withdrew the funds remaining in the H&R Block account, closed the account, and divided the funds equally between them.  The Debtor deposited his fifty percent of the funds into an account established in his name alone at Bank of America, and Marsha deposited her fifty percent of the funds into a checking account opened in her name alone at a different bank. (Transcript, pp. 74-75, 99-100; Plaintiff's Exhibit 18).

The Debtor filed his petition under Chapter 7 of the Bankruptcy Code on April 2, 2004.

On April 14, 2004, the Debtor filed his initial schedule of assets and liabilities in his Chapter 7 case.  On his schedule of real property, the Debtor listed his residence located in Sarasota, Florida, as owned by the "husband" alone.  He valued the residence at $375,000.00.  He also listed a "survivorship interest in parents home" in Tennessee as a contingent interest owned by the "husband" alone.  Finally, the Debtor listed a "Suntide Island, time share" valued at $500.00 as owned jointly with Marsha.

7

On his schedule of personal property, the Debtor listed various household goods valued at $850.00, the annuity valued at $142,630.00, and two accounts at Sarasota Coastal Credit Union, as owned jointly with Marsha. Certain other personal property, such as a checking account at Bank of America and an IRA was listed as owned by the "husband" alone.

On his schedule of property claimed as exempt, the Debtor listed the residence in Sarasota, the household goods, the annuity, and certain other property, as exempt pursuant to the Florida Constitution or Section 222 of the Florida Statutes. No property was listed as exempt based on its status as entireties property.

On May 20, 2004, the Debtor amended his schedule of real property to reflect that the residence was owned jointly with Marsha, and on July 7, 2004, the Debtor amended his Schedule F to reflect that the debt owed to the Plaintiff was contingent and disputed. He also amended his Schedule J to reduce his total monthly expenses.

On May 19, 2004, the Plaintiff filed its Complaint Objecting to the Debtor's Discharge. The Complaint contains four counts: Count I is an action to deny the Debtor's discharge pursuant to §727(a)(2)(A) based on the purchase of the annuity; Count II is an action to deny the Debtor's discharge pursuant to §727(a)(2)(A) based on the satisfaction of the home mortgage; Count III is an action to deny the Debtor's discharge pursuant to §727(a)(2)(A) based on the transfer of the boat and vehicles to Marsha; and Count IV is an action to deny the Debtor's discharge pursuant to §727(a)(4) based on alleged false statements in the Debtor's schedules.

The Debtor answered the Complaint and denied the material allegations. Additionally, the Debtor contends that neither the purchase of the annuity nor the satisfaction of the home mortgage can form

the basis for a cause of action under §727(a)(2)(A), because the funds used in these transactions were derived from property held as tenants by the entireties.

### Discussion

In its Complaint, the Plaintiff requests that the Court deny the Debtor's discharge pursuant to §727(a)(2)(A) and §727(a)(4) of the Bankruptcy Code.

## I. Section 727(a)(2)(A)

Count I, Count II, and Count III of the Complaint are based on §727(a)(2)(A). That section provides:

**11 USC § 727. Discharge**

(a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. §727(a)(2)(A). "Under §727(a)(2)(A), an objection to discharge will be sustained if the objecting party alleges and proves the following elements:  (1) the debtor transferred, removed, destroyed, mutilated, or concealed property; (2) belonging to the estate; (3) within one year of filing the petition; and (4) with the intent to hinder, delay, or defraud a creditor of the estate." In re Zwirn, 2005 WL 1978510, at 3 (Bankr. S.D. Fla.). See also In re Moeritz, 317 B.R. 177, 182 (Bankr. M.D. Fla. 2004).

9

### A. Counts I and II

In this case, the Debtor acknowledges that he purchased an annuity on April 22, 2003, for the sum of $142,630.00, and that he also satisfied his home mortgage on April 22, 2003, by virtue of a wire transfer in the lump sum amount of $117,246.75. (Transcript, p. 16; Doc. 43, p. 7).

The transactions clearly occurred within one year before the Debtor filed his bankruptcy petition on April 2, 2004.

#### 1. Intent to defraud

A critical issue under §727(a)(2)(A), therefore, is whether the transfers were made "with the intent to hinder, delay, or defraud a creditor of the estate."

"Courts should consider a debtor's whole pattern of conduct when determining whether the debtor acted with intent to defraud." In re Zwirn, 2005 WL 1978510, at 3. "Courts generally consider all of the evidence presented in a case to determine whether a debtor's transfers and nondisclosures were made with the actual intent to defraud his creditors." In re Hosmer, 2004 WL 1964509, at 5 (Bankr. M.D. Fla.).

In this case, several circumstances surrounding the purchase of the annuity and the satisfaction of the home mortgage indicate that the Debtor made the transfers with the intent to remove property from the reach of his creditors.

First, the Debtor is a sophisticated businessman. He was employed in the financial services industry for twenty years, oversaw the construction of his home in Sarasota, bought and sold a home in Tallahassee, and formed SEI with his business partner, Nicholas Eigsti. The Debtor testified that he "knew that the homestead was one of the strongest protections from creditors" under Florida law. (Transcript, pp. 83-86, 108).

10

Further, the transfers occurred within one week after the conclusion of a jury trial in District Court, in an action in which the Debtor was a defendant, and within two months after the District Court had entered a partial summary judgment against the defendants in the same case.

The Debtor asserts that he and Marsha had planned to purchase the annuity because of its higher interest rate, and that they had planned to use the proceeds from the sale of the Tallahassee house to satisfy their home mortgage, long before the transactions actually took place. According to the Debtor, however, they "just didn't get around to it" until after the demands of the jury trial had passed. (Transcript, pp. 148-49, 164).

Despite the Debtor's explanation, the business experience of the Debtor and the timing of the transfers are factors that weigh in favor of finding that he intended to hinder, delay, or defraud his creditors by purchasing the annuity and satisfying his home mortgage. Absent other considerations, therefore, these circumstances may have warranted a finding that the transfers were fraudulent within the meaning of §727(a)(2)(A) of the Bankruptcy Code.

### a. Transfer of entireties property

The Debtor contends, however, that he did not intend to defraud his creditors because the funds used in the transactions had been owned with his wife, Marsha, as tenants by the entireties. Consequently, the Debtor asserts that the funds were exempt from the claims of his creditors, and could not be the subject of a fraudulent transfer.

It is generally held that a debtor's transfer of exempt property cannot be avoided pursuant to the fraudulent transfer provisions of the Bankruptcy Code. In re Goldberg, 229 B.R. 877, 882-83 (Bankr. S.D. Fla. 1998).

In In re Dismore, 2005 WL 419709, at 1 (Bankr. M.D. Fla.), for example, the debtor had

transferred his interest in a Certificate of Deposit to his spouse, and the chapter 7 trustee sought to

avoid the transfer under §544 of the Bankruptcy Code and Florida's fraudulent transfer statute.  The

Court first found that the "CD was tenancy by the entireties property," and that the debtor's creditors

"did not have a claim against the CD prior to the transfer."  In re Dismore, 2005 WL 419709, at 1.

Consequently, the Court dismissed the avoidance action on the basis that the trustee had not shown

that the debtor possessed the requisite "intent to defraud" at the time that he made the transfer.

> Disposition of exempt property does not establish an intent to defraud creditors since
> creditors do not have a claim against the exempt property originally.  [Footnote
> omitted.]  An intent to defraud creditors cannot be established when a debtor converts
> exempt property to non exempt property.

In re Dismore, 2005 WL 419709, at 1 (Bankr. M.D. Fla.)(citing In re Short, 188 B.R. 857 (Bankr.

M.D. Fla. 1995)).

As long as the initial creation of the entireties estate was not fraudulent, therefore, courts generally

find that a subsequent transfer of an interest in the entireties property is not a fraudulent transfer.

> It is well established under Florida law that exempt property may not be recovered
> by a trustee on fraudulent transfer grounds because such property could not have been
> attached by creditors before any transfer.  See Sneed v. Davis, 135 Fla. 271, 184 So.
> 865 (1938).  The Florida fraudulent transfer act specifically excludes from treatment as
> a recoverable "asset" property held as a tenancy by the entireties to the extent that such
> property is subject to process by a creditor holding a claim against only one spouse.
> See Fla.Stat. §726.102(2)(c) (2001).  Therefore, as between spouses still married,
> "where the original transfer into entireties status is not fraudulent, a subsequent transfer
> of exempt entireties property [to one spouse] is not avoidable." Dzikowski v. Delson
> (In re Delson), 247 B.R. 873, 876 (Bankr. S.D. Fla. 2000).

In re Lankry, 263 B.R. 638, 644 (Bankr. M.D. Fla. 2001)(quoted in In re Stewart, 280 B.R. 268, 290

(Bankr. M.D. Fla. 2001)).

In this case, Count I and Count II relate to transfers from an investors account at H&R Block, and from a money market account at Liberty Savings Bank.  The Debtor contends that the two accounts were owned by him and Marsha as tenants by the entireties.  Consequently, the Debtor asserts that the transfer of funds from the accounts was not fraudulent based on the authorities discussed above.

### b. The presumption regarding entireties property

A central issue in this proceeding, therefore, is whether the funds held in the accounts at H&R Block and Liberty Savings Bank constituted entireties property under Florida law.

In 2001, the Supreme Court of Florida considered the issue of "whether bank accounts titled in the name of both spouses were held as tenancies by the entireties and, therefore, not subject to execution by a creditor of only one of the spouses." Beal Bank, SSB v. Almand and Associates, 780 So.2d 45, 48 (Fla. 2001).  After an extensive historical analysis of tenancy by the entireties property in Florida, the Court held:

> [A]s between the debtor and a third-party creditor (other than the financial institution into which the deposits have been made), if the signature card of the account does not expressly disclaim the tenancy by the entireties form of ownership, a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time and with right of survivorship.  The presumption we adopt is a presumption affecting the burden of proof pursuant to section 90.304, Florida Statutes (2000), thus shifting the burden to the creditor to prove by a preponderance of evidence that a tenancy by the entireties was not created.

Beal Bank, 780 So.2d at 58-59(Emphasis supplied).  In other words, a bank account titled in the name of a husband and wife is presumed to be owned by the spouses as tenants by the entireties, as long as the account possesses the unities required for such entireties property under Florida law.  "This presumption operates to shift the burden to the creditor to prove by a preponderance of evidence that a

tenancy by the entireties was not created."  In re Kossow, 325 B.R. 478, 485 (Bankr. S.D. Fla. 2005).

See also In re Daniels, 309 B.R. 54, 58 (Bankr. M.D. Fla. 2004).

### 2. The accounts

In this case, the Debtor contends that the investors account at H&R Block and the money market

account at Liberty Savings Bank were owned by him and Marsha as tenants by the entireties.

### a. The H&R Block account

The Debtor and Marsha opened the H&R Block (formerly Olde Discount Corporation) investors

account on October 12, 1999, while they were husband and wife.  (Plaintiff's Exhibit 2; Debtor's

Exhibit 4).  On the application for the account, the Debtor and Marsha checked the box indicating

"joint tenants with rights of survivorship" as the "type of account desired."  "Tenancy by the entireties"

was not printed on the application as a "type of account" offered, although applicants were permitted to

check "other," and write the type of the account that they desired in a blank space provided on the

form.

The Debtor and Marsha both acknowledge that they did not check "other" and specify tenancy by

the entireties as their chosen form of ownership, even though the Debtor was acquainted with the

concept of entireties property through his employment at Primerica Financial Services.  (Transcript,

pp. 43-44, 95-97).   In explaining why he did not designate "tenancy by the entireties" on the

application, the Debtor testified:

> Well, tenants of entireties is very close to joint tenants with rights to survivorship.  It
> just means we both own it, we're both married.  If I die, she receives it, and if she dies, I
> receive it.  It's a pretty simple thing.

(Transcript, p. 95).  Essentially, the Debtor focused primarily on the survivorship characteristic of

entireties property.  (Transcript, pp. 96-97).

In any event, the account was initially funded with a deposit in the amount of $200,000.00. (Plaintiff's Exhibit 2; Debtor's Exhibit 4). With respect to the initial deposit, the Debtor testified:

> May of '99 we received the first million dollars in that agreed-upon contract. It was split by Mr. Eigsti and myself, after the attorneys got their fees, and four-hundred-and-some-odd thousand dollars came to me. Yes. We put, I think approximately 200 of that into the Olde account to start investing and for retirement programs.

(Transcript, pp. 93-94). In other words, the account was funded with a portion of the money paid by the Plaintiff on May 21, 1999, pursuant to the Settlement Agreement between SEI, Eigsti, the Debtor and the Plaintiff. (Transcript, p. 161).

The Debtor and Marsha both testified that they considered the funds held in the account to constitute their joint funds. (Transcript, pp. 153, 162). Even though Marsha was not a party to the Settlement Agreement and not contractually entitled to any settlement proceeds from the Plaintiff, the Debtor testified that the H&R Block (or Olde Discount Corporation) account into which the proceeds were deposited "was a joint account. We would own it together. If something happened to me, she'd receive it. If something happened to her, I would receive it." (Transcript, p. 162).

The statements related to the account were addressed to "Terry L. Wingate & Marsha B. Wingate JT WROS." (Plaintiff's Exhibit 4; Debtor's Exhibit 5).

### b. The Liberty Savings Bank account

The Debtor and Marsha opened the money market account at Liberty Savings Bank on May 23, 2002, while they were husband and wife. (Plaintiff's Exhibit 9; Debtor's Exhibit 6). The receipt signed by the Debtor and Marsha when the account was opened does not specify a form of ownership. The Debtor testified that "we just told them we wanted a joint account." (Transcript, p. 110).

The account was funded on May 23, 2002, with an initial deposit in the amount of $157,552.50. (Plaintiff's Exhibit 9; Debtor's Exhibit 7). The funds used for the initial deposit were derived from the payment made by the Plaintiff on May 21, 2002, pursuant to the Settlement Agreement. (Transcript, p. 154).

Approximately six weeks later, in July of 2002, the Debtor and Marsha deposited the additional sum of $118,322.68 into the account. (Plaintiff's Exhibit 9; Debtor's Exhibit 7). This deposit represented the proceeds received from the sale of a house in Tallahassee that the Debtor and Marsha had purchased approximately two years earlier. (Transcript, pp. 147-48, 154) The home in Tallahassee was jointly titled in the names of the Debtor and Marsha. (Debtor's Exhibit 8; Transcript, p. 163).

The Debtor testified that the account at Liberty Savings Bank was "another joint account. It was our funds." (Transcript, p. 162).

### 3. Application

The Court has considered the circumstances surrounding the creation of the H&R Block account and the Liberty Savings Bank account, and concludes that the Plaintiff has not satisfied its burden of proving that the accounts were not held as tenants by the entireties. Beal Bank, 780 So.2d at 58-59.

As set forth above, courts generally find that a transfer of entireties property is not fraudulent, as long as the initial creation of the entireties estate was not fraudulent. In re Dismore, 2005 WL 419709, at 1; In re Lankry, 263 B.R. at 644. The Plaintiff does not appear to suggest that the initial creation of the accounts was intended to hinder, delay, or defraud the Debtor's creditors. The H&R Block account was opened in 1999, and the Liberty Savings Bank account was opened in 2002, before the Plaintiff filed its breach of contract action against the Debtor and the other defendants.

16

Further, the Supreme Court of Florida has held that "a presumption arises that a bank account titled in the names of both spouses is held as a tenancy by the entireties as long as the account is established by husband and wife in accordance with the unities of possession, interest, title, and time with right of survivorship." Beal Bank, 780 So.2d at 58-59.

In this case, the Plaintiff presented evidence that more than $357,000.00 of the funds deposited into the accounts originated from money paid to the Debtor under the Settlement Agreement. Marsha was not a party to the Agreement, and had no contractual claim to the settlement funds before they were paid. In fact, at one point the Debtor testified that "I made the funds," and "I felt like it was my money." (Transcript, pp. 88-89).

The Plaintiff also presented evidence that the Debtor and Marsha separately owned various property and incurred various separate debts during their marriage. The Debtor, for example, individually owned a fifty-percent interest in SEI, an account at Bank of America, an individual retirement account, and a one-third interest in real property in Tennessee where his parents reside. Marsha had no interest in these assets, and was not liable on a cell phone account in the Debtor's name alone. (Transcript, pp. 111-20).

Conversely, Marsha individually owned an IRA, certain household goods and antiques inherited from her family, and vehicles used both by her and the Debtor. Additionally, Marsha had a VISA account in her name alone, although it appears that purchases were made on the account for general household purposes. (Transcript, pp. 63-74).

The Debtor and Marsha have no joint credit card accounts. (Transcript, pp. 70, 115).

Further, the Plaintiff presented evidence that the Debtor and Marsha closed the H&R Block account in August of 2003, and divided the funds remaining in the account equally between them. The

Debtor deposited his fifty-percent share into an account established solely in his name, and Marsha deposited her fifty-percent share into an account opened in her name alone. (Transcript, pp. 74-75, 99-100).

On the Schedule of Property Claimed as Exempt filed in his bankruptcy case, the Debtor did not claim that any of the property listed on his Schedules was owned as tenants by the entireties. (Transcript, pp. 126-27).

Based on this evidence, the Plaintiff contends that the Debtor and Marsha acquired property in their individual names as a matter of practice during their marriage. Not all of their property was jointly owned, with the result that the presumption of entireties property should not apply to the H&R Block account and the Liberty account.

The evidence presented by the Plaintiff, however, does not show that the H&R Block account and the Liberty account were not established "in accordance with the unities of possession, interest, title and time with right of survivorship," as required for the creation of a tenancy by the entireties. <u>Beal Bank</u>, 780 So.2d at 52, 58-59.

First, it is undisputed that the Debtor and Marsha were married at all times relevant to this controversy (unity of marriage).

Second, it is also undisputed that the Debtor and Marsha each possessed a right of survivorship with respect to both accounts. The H&R Block account was opened as a joint tenancy "with rights of survivorship," and the Liberty account receipt and statements reflect that the funds in the account were to be "paid on death."   (Plaintiff's Exhibits 4, 9; Debtor's Exhibits 5, 7).

In this regard, it is significant that the accounts do not reflect any express disclaimer that the property was not owned as tenants by the entirety. See <u>Beal Bank</u>, 780 So.2d at 61("[W]e respectfully

disagree that a statement that an account is held as a joint tenancy with right of survivorship constitutes an express disclaimer that it is not held as a tenancy by the entireties. As we have explained, a tenancy by the entireties is 'essentially a joint tenancy modified by the common-law doctrine that the husband and wife are one person.' *Hector Supply Co.*, 254 So.2d at 780.").

Third, the evidence establishes that the interests of the Debtor and Marsha in the accounts commenced simultaneously (unity of time) and originated in the same instrument (unity of title). The evidence shows that the Debtor and Marsha went together to the bank offices and opened the accounts as joint accounts. (Transcript, pp. 152-54). The signatures of both spouses appear on the Olde Investors Account Application and the Liberty Savings Bank receipt and account agreement, and the documents were signed on the same date. (Plaintiff's Exhibits 2, 9; Debtor's Exhibits 4, 6).

Fourth, the evidence establishes that the Debtor and Marsha maintained joint ownership and control of the accounts (unity of possession), and that the interests of the Debtor and Marsha in the accounts were identical (unity of interest). The accounts were expressly opened as joint accounts, and the spouses had equal access to both accounts. Two signatures were required for the withdrawal of any funds from the H&R Block account. (Transcript, p. 153). Although only one signature was required for the withdrawal of funds from the Liberty account, this feature does not automatically defeat the unity of possession. Beal Bank, 780 So.2d at 62.

Most significantly, the Debtor and Marsha testified that they had historically treated their assets as belonging to both of them, without distinction, and that they considered the funds held in the accounts as joint funds for use in the marriage. "Well, anything that came to the house there was always considered ours generally." (Transcript, p. 88). "We have always – in the past, she made money, I made money, and we pooled it together, we'd go forward in life and try to do things. I mean, we built

our house together alone with nobody, okay. We've always done things together." (Transcript, p. 89, quoting Deposition of Terry Wingate, p. 12). Marsha considered the money in the H&R Block account to be "our money," and the Debtor understood that he and Marsha would own the H&R Block account "together," and that the funds in the Liberty account were "our funds." (Transcript, pp. 153, 162).

Additionally, more than $118,000.00 of the funds deposited in the Liberty Savings Bank account represented proceeds received by the Debtor and Marsha from the sale of a house that they had previously purchased in Tallahassee. (Plaintiff's Exhibit 9; Debtor's Exhibit 7). The Tallahassee house was owned jointly by the Debtor and Marsha. (Debtor's Exhibit 8).

The property in Tallahassee was owned by the Debtor and Marsha as tenants by the entireties. "Where real property is acquired specifically in the name of a husband and wife, it is considered to be a 'rule of construction that a tenancy by the entireties is created, although fraud may be proven.'" Beal Bank, 780 So.2d at 54(quoting First Nat'l Bank v. Hector Supply Co., 254 So.2d 777, 780 (Fla. 1971)). Accordingly, the proceeds from the sale of the Tallahassee property also constituted entireties property. "The proceeds from the sale or rental of tenancy by the entireties property are also held as a tenancy by the entireties and are owned in total by both the husband and the wife." Passalino v. Protective Group Securities, Inc., 886 So.2d 295, 297 (Fla. 4th DCA 2004).

The proceeds from the sale of the Tallahassee property constituted entireties property when it was deposited into the account at Liberty Savings Bank.

The Court has considered all of the evidence, and finds that the Plaintiff did not satisfy its burden of proving that the H&R Block account and the Liberty Savings Bank account were not held by the Debtor and Marsha as tenants by the entireties. Although a significant portion of the funds originated

from the proceeds of a Settlement Agreement owned solely by the Debtor, the Court is persuaded that all of the characteristics of a tenancy by the entireties were present, and that the Debtor and Marsha intended to hold and use the funds deposited into the accounts as marital assets.

The Debtor and Marsha had jointly owned property throughout their thirty-year marriage, and the evidence presented by the Plaintiff did not establish that they intended to create divisible rights when they opened the accounts. The Plaintiff did not show by a preponderance of the evidence that the accounts were not established "in accordance with the unities of possession, interest, title, and time with right of survivorship," and therefore were not owned by the Debtor and Marsha as tenants by the entireties. Beal Bank, 780 So.2d at 52.

The Plaintiff did not rebut the presumption that the H&R Block account and the Liberty Savings Bank account constituted entireties property. Consequently, the use of funds from the accounts to purchase the annuity and satisfy the home mortgage did not constitute fraudulent transfers within the meaning of §727(a)(2)(A) of the Bankruptcy Code. In re Dismore, 2005 WL 419709, at 1; In re Lankry, 263 B.R. at 644.

Judgment should be entered against the Plaintiff and in favor of the Debtor with respect to Count I and Count II of the Complaint.

**B. Count III**

In Count III of the Complaint, the Plaintiff contends that the Debtor's discharge should be denied pursuant to §727(a)(2)(A) of the Bankruptcy Code, based on the transfer to Marsha of the Debtor's interest in two vehicles and a boat.

The Plaintiff and the Debtor stipulated that "on July 23, 2003, the following assets were transferred out of "Terry Wingate or Marsha Wingate" ownership into Marsha Wingate's name

individually: 1) a 1999 22-foot Maverick Boat Company boat, purchased for more than $20,000; 2) a

1997 Chevy Tahoe; and 3) a 1996 Chrysler Town and Country minivan. The Debtor did not receive

any consideration for these transfers." (Transcript, pp. 16-17).

Marsha Wingate has consistently attested that she unilaterally effectuated the transfer of the boat

and vehicles without the Debtor's prior knowledge or consent. In her Affidavit prepared in relation to

cross-Motions for Summary Judgment, for example, Marsha Wingate stated:

> 4. During the year 2003, my husband and I were having serious marital problems
> as a result of many issues, including the actions of my husband's partner, Nicholas
> Eigsti, who had allegedly violated their agreement with Syngenta Seeds. In an effort to
> get my affairs "in line", I went to the vehicle registration office, on my own and with no
> direction or instructions from anyone, and put our vehicles and boat, which were titled
> Terry Wingate or Marsha Wingate, into my own name. Those vehicles were
> specifically a 1996 Chrysler Town & Country Mini-Van, a 1997 Chevy Tahoe, and a
> 1999 22' Maverick Boat. At the registration office, it was explained to me by an
> employee there, that only my signature was required. . . .

> 5. . . . Terry Wingate was not apprised of my actions and did not realize what I
> had done until some time later when something came in the mail regarding the
> registrations and/or renewal of the license plates.

(Plaintiff's Exhibit 11).

The statements in the Affidavit are consistent with Marsha's testimony at trial and at deposition,

and are also consistent with the Debtor's trial testimony that he lacked prior knowledge of the transfers.

(Transcript, pp. 57-63, 130-31). The statements are also consistent with the Debtor's Affidavit

prepared in relation to the cross-Motions for Summary Judgment, wherein he attested that Marsha

transferred the boat and vehicles without his knowledge or cooperation. "I did not find out about the

transfers until I opened the mail several months later and saw that the renewal registrations were in her

name solely. I in no way encouraged this transfer or discussed the matter with her prior to receiving

the registration renewals." (Plaintiff's Exhibit 12).

The testimony and attestations are not contradicted.

Section 727(a)(2)(A) provides that the Court shall grant the debtor a discharge, unless "the debtor . . . has transferred . . . or has permitted to be transferred" his property within one year before the date that he filed his bankruptcy petition.  11 U.S.C. §727(a)(2)(A)(Emphasis supplied).

To prevail under §727(a)(2)(A), a creditor must show that the act complained of was an act of the debtor, among other elements required for the cause of action.  In re Halperin, 215 B.R. 321, 328 (Bankr. E.D.N.Y. 1997)(cited in In re Lombardi, 263 B.R. 848, 854 (Bankr. S.D. Ohio 2001) and In re Ostrovsky, 224 B.R. 832, 833-34 (Bankr. M.D. Fla. 1998)).  An "objection to discharge pursuant to §727(a)(2) must relate to an act of the debtor."  In re Halperin, 215 B.R. at 332.

In this case, the Plaintiff has not shown that the Debtor undertook any action with respect to the transfer of the boat and the vehicles to Marsha.  Accordingly, the transfers did not constitute fraudulent transfers by the Debtor within the meaning of §727(a)(2)(A) of the Bankruptcy Code.  Judgment should be entered in favor of the Debtor with respect to Count III of the Complaint.

## II. Section 727(a)(4)

In Count IV of the Complaint, the Plaintiff asserts that the Debtor's discharge should be denied because he "knowingly and fraudulently took a false oath in this case by underestimating the value of Scheduled assets and mischaracterizing ownership of certain assets in his Schedules." (Doc.1).  Count IV is based on §727(a)(4) of the Bankruptcy Code.

Section 727(a)(4) provides:

**11 U.S.C. § 727.  Discharge**

(a) The court shall grant the debtor a discharge, unless—

. . .

23

(4) the debtor knowingly and fraudulently, in or in connection with the case—

      (A) made a false oath or account.

11 U.S.C. § 727(a)(4).  "In order to bring a successful §727(a)(4)(A) claim for false oath, the plaintiff must show:  (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."  In re Roberts, 331 B.R. 876, 882 (9th Cir. BAP 2005).  See also In re Zwirn, 2005 WL 1978510, at 5 (Bankr. S.D. Fla.).  "[A] false oath may involve a false statement or omission in the debtor's schedules."  In re Roberts, 331 B.R. at 882.

## A.  The alleged false oaths

In its Complaint, the Plaintiff alleges that the Debtor "failed to properly value assets in his Schedules, including a timeshare and a Sarasota Coastal credit account.  The Debtor also mischaracterized his ownership of certain assets, such as real property owned in Tennessee." (Doc. 1, p. 2).

### 1.  The Tennessee property

On his original Schedule of Real Property, the Debtor listed a "survivorship interest in parents home in Seviewille, TNN."  He described the nature of his interest in the property as "contingent."  He also listed the assessed value of the property as $38,000.00, and the current market value of his interest as $0.00.

The Debtor filed an Amended Schedule of Real Property on May 20, 2004, but did not amend the description of his interest in the Tennessee property.

On July 2, 1999, a Quitclaim Deed was recorded in the public records of Sevier County, Tennessee, evidencing the transfer of the Tennessee property from the Debtor's parents, John C.

Wingate and Martha L. Wingate, to "Terry L. Wingate and John C. Wingate and wife, Martha L. Wingate, as joint tenants with right of survivorship it being intended at the time of death of any, that the entire fee vest in the survivor or survivors." (Plaintiff's Exhibit 23; Debtor's Exhibit 11). The Real Estate Assessment on the property for the 2004 tax year lists "Wingate Terry L. & John C. & Martha L. Wingate" as the property owners. (Plaintiff's Exhibit 24).

Based on the Quitclaim Deed and public records, the Plaintiff contends that the Debtor owns a present one-third interest in the Tennessee property, and not a contingent survivorship interest as stated on his Schedules.

The Debtor testified that he understood his interest to constitute a contingent interest because his father told him that he had "set up" his financial affairs so that his children would receive his property after he passed away. The Debtor testified that his father's intention was to create a survivorship interest, and that he continues to understand that he will only receive the property when his parents die. (Transcript, pp. 120, 173-74).

### 2. The timeshare

On his original Schedule of Real Property, the Debtor listed an interest in "Suntide Island, Time Share," and valued the interest at $500.00. He did not revise the description or value of his interest in the timeshare in his Amended Schedule of Real Property filed on May 20, 2004.

In June of 1981, the Debtor and Marsha purchased "an undivided $1/51^{st}$ interest in and to Condominium Unit(s) #137" in Suntide Island Beach Club, "together with the exclusive right to occupy" the unit during week #28, as described in the condominium documents. (Debtor's Exhibit 10). The Debtor testified that Unit #137 is a two-bedroom, two-bath unit approximately five hundred yards from the water on Lido Beach. (Transcript, p. 129).

The Plaintiff contends that the rental rate for a two-bedroom, two-bath unit during week #28 at Suntide Island Beach Club is approximately $1,050.00 per week. This estimated rental rate is based on the weekly rates set forth on the Island Beach Club's web site. (Plaintiff's Exhibit 13). Accordingly, the Plaintiff asserts that the Debtor materially undervalued his interest in the timeshare unit.

The Debtor testified that his scheduled value of the timeshare ($500.00) was based on two sources of information. First, the Debtor stated that he had received a listing of Suntide timeshare units that were for sale approximately five or six months before he filed his bankruptcy petition, and that the listed price for a two-bedroom unit during a comparable time period was "about 200 bucks." Second, the Debtor testified that he knew of another owner who had listed his unit for sale for $1,500.00 for one and one-half years, and who had been unable to sell the unit at that price. (Transcript, pp. 172-73).

### 3. The Sarasota Coastal Credit Union accounts

On his Schedule of Personal Property, the Debtor listed a checking account at Sarasota Coastal Credit Union containing $50.00, and a savings account at the Credit Union, also containing $50.00. Both of the accounts were listed as joint accounts. The Debtor was the primary member with respect to both of the joint accounts listed on his schedules.

Marsha was the primary member with respect to a third account at Sarasota Coastal Credit Union. Although this third account was also a joint account, it was not listed on the Debtor's schedules.

The Plaintiff had garnished the third account shortly before the Debtor filed his bankruptcy petition, and the Debtor testified that "there wasn't any assets in there." (Transcript, pp. 75-77, 135-36).

26

### 4. The vehicles

Marsha effectuated the transfer of the boat and two vehicles into her name in July of 2003. (Transcript, pp. 16-17). The Debtor filed his petition under Chapter 7 of the Bankruptcy Code on April 2, 2004. The Debtor did not disclose the transfers in response to Question 10 on his Statement of Financial Affairs as transfers of property within one year immediately preceding the commencement of the bankruptcy case.

On his Schedule of Personal Property, the Debtor stated that he "uses wife's vehicle."

### B. Application

The Court finds that the Debtor did not "knowingly and fraudulently" make any false oaths in connection with this case.

With respect to the value of the timeshare, for example, the Debtor explained his basis for the valuation, and his method of valuation appears reasonable. The Plaintiff did not establish that the Debtor knew that the true value of the timeshare exceeded the sum of $500.00.

With respect to the status of the Sarasota Coastal Credit Union account, the Plaintiff did not establish that the Debtor intended to defraud his creditors by failing to list the account. It is undisputed that the account had been garnished before the bankruptcy petition was filed, and the Debtor disclosed the garnishment in response to Question 4b on his Statement of Financial Affairs.

With respect to the Tennessee property, it appears that the Debtor inaccurately characterized his interest in his parents' home. The recorded deed and public records indicate that the Debtor in fact owns a present one-third interest in the property, instead of a contingent survivorship interest as reflected on his schedules.

The Court finds, however, that the Debtor did not fraudulently make the erroneous statement on his schedules, as required by §727(a)(4) for denial of a debtor's discharge. "To be fraudulent, the oath must be made with 'a knowing intent to defraud creditors.'" In re Bratcher, 289 B.R. 205, 218 (Bankr. M.D. Fla. 2003). "[T]he type of fraud contemplated under §727(a)(4) is that of actual fraud,--as opposed to constructive fraud or fraud imposed by law--which looks to a defendant's subjective state of mind at the time of the transaction in question." In re Halishak, 2005 WL 3729399, at 3 (Bankr. N.D. Ohio).

In this case, the Court observed the demeanor of the Debtor, and found him to be credible. The Debtor testified that he believed that his interest in the Tennessee property constituted a survivorship interest, and he explained his basis for that belief. (Transcript, pp. 173-74). The Debtor did not attempt to conceal the property from the Chapter 7 Trustee. On the contrary, the property was listed on the Debtor's original schedules, and the Trustee examined the Debtor about the property at his §341 meeting. (Plaintiff's Exhibit 26, pp. 6-7). The evidence does not establish that the erroneous characterization of the interest was the result of the Debtor's actual fraudulent intent.

The Plaintiff has asserted that the Debtor made a series of false oaths on his bankruptcy schedules. The Court has considered the statements at issue, and cannot find that the Debtor intended to defraud his creditors when he signed his schedules, or that he engaged in a pattern of conduct evidencing his disregard for the truth.

The Debtor's discharge should not be denied pursuant to §727(a)(4) of the Bankruptcy Code.

**Conclusion**

The Plaintiff filed a Complaint seeking the denial of the Debtor's discharge pursuant to §727(a)(2)(A) and §727(a)(4) of the Bankruptcy Code. The Court determines that a judgment should be entered in favor of the Debtor as to all counts of the Complaint.

As to Count I and Count II of the Complaint, the Court finds that the Debtor and his wife, Marsha Wingate, owned the investors account at H&R Block and the money market account at Liberty Savings Bank as tenants by the entireties. Accordingly, the transfer of funds from those accounts to purchase an annuity and to satisfy his home mortgage did not constitute fraudulent transfers within the meaning of §727(a)(2)(A) of the Bankruptcy Code.

As to Count III of the Complaint, the Court finds that the Plaintiff did not show that the transfer of the boat and vehicles to the Debtor's wife constituted "an act of the Debtor" within the meaning of §727(a)(2)(A) of the Bankruptcy Code.

As to Count IV of the Complaint, the Court finds that the Plaintiff did not show that the Debtor "knowingly and fraudulently" made any false oaths in connection with his bankruptcy case.

Judgment should be entered in favor of the Debtor, and against the Plaintiff, on the Complaint Objecting to the Debtor's Discharge.

Accordingly:

**IT IS ORDERED** that:

1. Final Judgment will be entered in favor of the Debtor, Terry Lee Wingate, and against the Plaintiff, Syngenta Seeds, Inc., on the Complaint Objecting to the Debtor's Discharge.

2. A Discharge of Debtor shall be entered in this case.

29

3.  The Court will enter a separate Final Judgment consistent with this Opinion.

**DATED** this 15th day of ___June___, 2006.

**BY THE COURT**

PAUL M. GLENN
Chief Bankruptcy Judge

30